[No. F030635. Fifth Dist. Nov. 24, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
OCTAVIO JAMAL HENDERSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IB.2, II and III of the Discussion.

454

## COUNSEL

Maureen J. Shanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger and Ruth M. Saavedra, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SILVEIRA, J.***—By information filed in Kern County Superior Court, appellant, Octavio Jamal Henderson, was charged with three counts of drawing or exhibiting a deadly weapon, to wit, a pit bull, with the intent to resist or prevent the arrest of himself or another, in violation of Penal Code section 417.8 (counts 1 through 3), and one count of obstructing Deputies Money and Lostaunau in the performance of their lawful duties by means of violence or threat of violence, in violation of Penal Code section 69.[1] Appellant denied the charges and requested a jury trial.

The information was later amended to add Deputy Hakker's name to count 1, Deputy Money's name to count 2 and Deputy Lostaunau's name to count

---

*Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All statutory references are to the Penal Code unless otherwise indicated.

3. Appellant thereafter entered not guilty pleas to each of the counts as amended.

The matter proceeded to jury trial and, on February 9, 1998, appellant was found guilty as charged. Imposition of judgment took place on March 13, 1998. Probation was denied and appellant was sentenced as follows:

Count 1 The upper term of four years

Count 2 The upper term of four years, with all but one year stayed, to be run consecutively to the term imposed on Count 1

Count 3 The upper term of four years to be run concurrent to the time imposed on Count 1

Count 4 The upper term of three years stayed pursuant to section 654.

He was thus ordered imprisoned for a total term of five years less appropriate time credits.

Notice of appeal was timely filed on April 9, 1998. Here, appellant challenges the sufficiency of the evidence to support the deadly weapon and intent elements of his section 417.8 convictions as well as the sentences imposed on those three counts. We affirm.

FACTS

*The Prosecution's Case-in-Chief*

On October 31, 1997, Kern County Sheriff's Deputy Hakker was dispatched to 3108 Lexington Avenue to investigate a report of two men fighting with sticks. The fight was reported to be over an elderly female.

On his arrival, Deputy Hakker learned that Terry Henderson, his brother (appellant), and the ...other of the two men, Margaret Long, were involved in the altercation. The problem was temporarily resolved with the removal of Terry Henderson from the residence.

Later that day, Terry Henderson called 911 from the house and reported that his mother was threatening to shoot him with a gun. A female, who subsequently identified herself as Margaret Long, then got on the phone and told the dispatcher she was going to blow the male caller's head off. Officers were immediately dispatched to the 3108 Lexington Avenue address to investigate, while the dispatcher tried to keep Ms. Long on the phone. Ms.

Long put the phone down but, for officer safety reasons, the dispatcher stayed on the line and listened.

Deputy Hakker was the first officer on the scene. Deputy Money arrived a short time later.

Deputy Hakker contacted Terry Henderson on the sidewalk in front of the residence. Terry reported that he had returned to the residence to pick up a few of his belongings when he and appellant got into another fight. Terry reported that Ms. Long then pointed a handgun at his head and threatened to shoot him.

As Deputy Hakker approached the front of the residence, he could see Ms. Long through the closed security door. She was sitting on the couch talking on the phone. The deputy heard her direct someone to let him in. Posted at the front door was a sign with a handgun pointed in the direction of the visitor that said, "Don't worry about the dog, beware of owner."

Deputy Hakker entered the residence and asked Ms. Long about the location of the gun. Ms. Long, agitated and upset, held up her arm and said, "Here it is; it is my walking stick." She then threw down the stick and the phone while continuing to scream and yell. Deputy Hakker continued to believe there was a gun in the house, despite Ms. Long's protestations to the contrary.

In an effort to defuse the situation, Deputy Hakker ordered Ms. Long to leave the living room where the other family members were located and join him in the doorway. As Ms. Long began to walk towards the officers, several family members began yelling that he was not to arrest their mother. Deputy Hakker tried to explain that he was only going to put her in his patrol vehicle until things quieted down.

Somewhere between seven and nine family members, including appellant, then began pulling Ms. Long out of the deputy's grasp and back into the residence. About this time, Deputy Lostaunau arrived on the scene.

Deputy Money, meanwhile, positioned himself just outside the front door. But when Deputy Hakker, looking frightened, called for his help, he moved just inside the residence and kept his leashed dog Jet just outside the door.

Some family members, including appellant, threatened to "kick [Deputy Hakker's] ass." Deputy Hakker was only five to eight feet away from appellant when the latter said, "Someone shoot that motherfucker."

Deputy Hakker watched as appellant walked out of the living room and to the back door of the residence. When appellant returned, he was dragging a full size, white pit bull by the collar. The dog had its front feet off the ground as it growled at Deputy Hakker and tried to break free of appellant's hold. They were only six to ten feet away from Deputy Hakker at this time.

Appellant seemed to be trying to keep the dog agitated; so agitated that if he let go, the dog would attack the deputy. The dog continued to growl, snap and bark at the officer.

Appellant repeatedly told Deputy Hakker to let Ms. Long go or he would let the dog loose. Appellant, still extremely agitated and upset, was very clear regarding his intentions. The deputy feared for his personal safety and warned appellant that he would shoot the dog if it was released.

Appellant then picked up the dog and, carrying it on his right side, got within three feet of Deputy Hakker. The deputy feared he would be bitten if they got any closer as the dog continued to snap at him while it tried to break free. So, the deputy pulled out his pepper spray and warned appellant one last time to put the dog away. Appellant came within one and one-half feet of the officer. He then turned and, as he passed the officer, told the deputy he would be sorry if he did not release his mother Ms. Long. Appellant then secured the dog in one of the bedrooms and returned to the living room.

Deputy Hakker kept on with his efforts to get Ms. Long out of the residence, but continued to meet with opposition from other family members. One of them, a 10-year-old boy, grabbed Ms. Long's walking stick and swung it at the deputy's head, missing it by only a few inches. Appellant joined in the yelling and told Deputy Hakker that he had "no motherfucking right" and to "[k]ill the motherfucker."

Appellant came at Deputy Hakker as the latter exited the residence with a cooperative Ms. Long. Appellant, still in an extremely agitated state, continued to yell at the deputy. When he got within three feet, Deputy Money sprayed appellant with pepper spray. Jet, Deputy Money's canine partner, apparently got so excited by all the yelling and pulling that he bit Deputy Hakker without being commanded to bite anyone.

Deputy Hakker had worked with this dog regularly and had never seen the dog so upset. Deputy Money, however, said he had seen the dog that excited in training. He believed the dog may have bitten in this case because Deputy Hakker backed into him.

Deputy Hakker finally secured Ms. Long in his patrol vehicle. He then returned to the residence intending to arrest appellant for his actions against him and for assaulting Terry Henderson.

When Deputy Hakker entered the house, appellant ran to the side yard where he grabbed a white or gray adult pit bull.[2] With this deputy in pursuit, appellant carried the dog to the three-foot fence in the front yard and held it near the top while shaking it. He pointed the dog in the direction of Deputies Money and Lostaunau, who were on the other side of the fence, and threatened to let it go so it could attack or kill each of the deputies and Deputy Money's canine partner, Jet. Deputy Lostaunau was only a foot away from the fence when appellant first put the dog up there, but backed up a few feet. Appellant was extremely upset and kept shaking the pit bull, which was already extremely agitated. The pit bull continued to snap and bark while it tried to pull itself over the fence to get to the two deputies on the other side. Appellant was told to put the dog down. Deputy Money, who was seven to ten feet away from Deputy Lostaunau, drew his sidearm and, fearing an attack, told appellant he would shoot the dog if appellant released it.[3] He had no doubt that appellant was threatening him with the dog. He never heard appellant claim to be holding the dog back to prevent injury to the officers. Deputy Lostaunau told appellant he was under arrest and, also fearing an attack by the dog, sprayed the pit bull with pepper spray. The dog then got free of appellant's grasp. According to Deputy Hakker, appellant ran into the house at this time. Deputy Lostaunau, on the other hand, said appellant began to pick up another pit bull and did not run for the house until after the deputy sprayed the entire area with pepper spray.

About this time, a black labrador sprinted out of the front door and straight towards Deputy Money and his canine partner, Jet, who were now in the street in front of the house. According to Deputy Lostaunau, the labrador was not drooling or barking; he merely ran like one dog would run to another. Deputy Money, however, said the dog was running low to the ground. He was not sure the labrador could see Jet, because he was on the other side of a car that was parked in front of the residence. Deputy Money yelled for someone to get the labrador but there was no time. Within seconds, the deputy fired his gun at the dog. Deputy Money said he did not realize it was a labrador until after he shot it; he thought it was one of the pit bulls. Even though the dog was struck twice, it was not killed and limped away.

Meanwhile, Deputy Hakker tried to gain entry into the house but found the front security door locked. He found the side door locked as well but

---

[2] Deputy Lostaunau thought this was the same dog appellant had when he was inside the house, while Deputy Hakker thought they were different pit bulls. All three deputies described the dog as either white or gray.

[3] The deputy said departmental policy allows him to use deadly force to prevent death or serious bodily injury to himself or another person; to prevent a crime in which someone could be killed or seriously injured; or to prevent the escape of a fleeing felon who is endangering others by his or her actions.

kicked it in and, along with Deputy Lostaunau, pursued appellant into a bedroom. Deputy Lostaunau said appellant knew the officers were trying to gain entry and deliberately shut the door in their faces.

When the officers reached the bedroom, they found the door closed. They ordered appellant to open the door but he refused, saying he had to hold back the dogs so they would not attack the officers. This was the first time appellant had made such a claim. Deputy Lostaunau reminded appellant that he was under arrest and directed him to come out.

When Deputy Hakker kicked open this door, he was met by two charging pit bulls. Another white pit bull and the injured black labrador, who were also in the room, did not join in.[4] Deputy Lostaunau sprayed both charging dogs with pepper spray and directed appellant to come out with his hands behind his back. Appellant finally complied and the officers were able to handcuff him. They experienced no other problems with appellant after this point.

Once everything calmed down, appellant told Deputy Lostaunau that the officers had misunderstood his actions. Appellant said he was not trying to interfere and specifically denied having threatened the officers. He claimed to have been holding the dogs back to protect the officers. Deputy Lostaunau never saw appellant do anything that was consistent with this last claim.

Deputy Hakker characterized the dogs at the house as vicious. He said they were extremely agitated and trying very hard to get loose while growling and snapping at the officers. He confessed to being afraid of these dogs and appellant.

Since this incident, the Lexington residence has been given the special designation of "hazard," which means a minimum of two officers will be dispatched whenever they are summoned there.

The next prosecution witness testified about dogs. Mr. Hanks, a professional dog trainer for approximately 30 years, said he has trained dogs for field work and various types of law enforcement work. For the past eight years, he has worked as a Kern County Animal Control Officer and, for the last four years, as an investigator for the department. In this latter capacity, it is his responsibility to investigate claims of animal cruelty and illegal

---

[4]Deputy Hakker thought there were more dogs at the residence but these were the only ones in this bedroom. At the preliminary hearing and the trial, the deputy acknowledged that he may have seen the same dog more than once in the bedroom and counted incorrectly. He and Deputy Lostaunau said there were at least three dogs in the room.

animal fighting. As a result, he has learned a lot about labradors and pit bulls. Most of the blood sports cases he has studied and investigated have involved pit bulls.

He explained that a pit bull trained to fight in a ring is typically animal aggressive and people friendly. Their untrained counterpart is generally very animal aggressive (this seems to be the dog's nature) and is not always people friendly. Whether a pit bull will be people friendly seems, in large part, to be dependent upon the manner in which it is raised. He personally does not consider them to be people friendly dogs due to his involvement in serious altercations with pit bulls on a day-to-day basis. He also found that they can be very protective of people and property.

When asked whether the pit bull has the capacity to cause great bodily injury or death to a human, Mr. Hanks replied, "Most definitely." He had just published an article with the Humane Society of the United States on the biting power of various breeds of dogs. He noted that it only takes four pounds of pressure per square inch to break a human's finger. The biting power of the german shepherd is 900 to 1,200 pounds per square inch, the rottweiler is 1,700 to 1,800 pounds per square inch, and the pit bull has the most powerful bite at 2,400 to 2,500 pounds per square inch. Pit bulls can crush bones and inflict great bodily harm or death. Mr. Hanks also cited to the all too frequent news report of pit bulls mauling someone. Dealing with pit bulls can be far more dangerous than other breeds because they have a locking mechanism in their jaw. Once they grab hold, they normally will not let go, but will instead keep biting and shaking. If they get into a frenzy, they lose sight of what they are doing, whereas other breeds will normally bite and back off.

Mr. Hanks had also encountered vicious labradors. He has found they can be aggressive when it comes to protecting property and are also capable of inflicting great bodily injury to a person. He also said labradors can be animal aggressive; while this does not happen on a regular basis, it does happen frequently. It has a lot to do with the dog's temperament.

Mr. Hanks was then asked how he would respond, as a dog handler, if a labrador were running right at him and he could not get it to stop. Knowing the dog was capable of causing considerable harm, he said he would shoot it if that is what it took to stop the animal and protect himself. He has had to shoot dogs that have come at him when other means of deterrence were not effective, although he has never shot a labrador. He acknowledged that it is common for a dog to run up to an unknown dog to investigate, particularly if the strange dog is on the first dog's property.

Mr. Hanks also admitted that dogs tend to get excited if there is a lot of confusion going on around them. Depending on the circumstances, they also could get very excited if another dog was around. The correct thing to do is to restrain the animal if it gets excited. Mr. Hanks believed pit bulls could be restrained.

He was then asked whether an owner could hold a dog in such a way as to agitate it or make it more aggressive. Mr. Hanks said that holding an animal by its collar while lunging it at something and commanding it to do something would be one way to accomplish that goal.

*The Defense Case*

Appellant's mother, Ms. Long, testified that, at the time of this incident, she was sharing the Lexington Avenue residence with appellant, her daughter, and some children. She also had a number of dogs, which she raised to be pets, not vicious animals. She volunteered that she did not fight her dogs and would not let anyone else do so either.

At the time of this incident, she had a pit bull named Hercules, which she bought as a pet for her 10-year-old grandson, Eric. Hercules no longer lived with them, as someone had stolen him. She also had a pit bull named Leo that slept with her and loved to give kisses. She had two black dogs—a trained black labrador named Logan and another black dog named Michael Belly or Touchie.

She kept Leo indoors all the time because she "got a little aggressive" after being spayed. Ms. Long was not sure how she would react when someone came to the door, so they locked her up whenever someone came to visit. Leo had not been attack trained.

Ms. Long admitted having a sign at her front door that said something about guns but denied having any in the house. She said she hated guns and had broken appellant's into pieces.

Ms. Long said she called 911 the first time on that day in October because Terry and appellant had gotten into a fight using sticks. She said things settled down temporarily once Deputy Hakker removed Terry from the residence.

However, when Terry returned, he told her that he was going to get her. He then called 911 and told the dispatcher that she had a gun to his head. Ms. Long took the phone away from him and told the dispatcher that she did

not own a gun. At trial, she denied even having her walking stick with her at the time. She said the only thing she had that he might have thought was a gun was a pencil. Ms. Long said she asked the dispatcher to send an officer out to the residence because Terry was trying to kill her. The dispatcher said he would send someone and directed Ms. Long to open the door for the officers and to stay on the line until they arrived.

She said the officers arrived and immediately asked about the location of the gun. She told them she did not have a gun and unbuttoned her pants to prove it. Ms. Long later admitted telling the dispatcher she had a gun so she would get them to respond more quickly.

The prosecutor then asked her if she later told the dispatcher that she did not have a gun but had a good knife she could get if he (presumably referring to Terry) came back through the door. Ms. Long said she did tell the officer about not having a gun but denied making the rest of the statement. When told the 911 tape would be played for her, Ms. Long retreated from her unwavering denial, to a position of not remembering having made the statement, and to finally admitting that she did make the comment.

Ms. Long said the officer then grabbed her arms, handcuffed one of them and explained that he only wanted to talk to her. As he began to lead her out of the house, the grandchildren tried to pull her back inside.

Ms. Long acknowledged that appellant had Leo (or Cleo) in his arms at this time, but claimed he was merely trying to restrain the dog. Leo was not barking and made no attempt to bite anyone at that time although she "would have" had she been let go. Ms. Long initially said appellant did not threaten the officers; he merely asked the officers not to hurt her. She understood how someone could make a mistake about what was said, given all the confusion at the time. A short time later, however, she said she did not *hear* him threaten the officer; that it was so loud some things may not have been clear for anyone. But her testimony made it clear she could hear what her grandchildren were saying and she was sure they had not threatened the officer.

She was finally seated in the patrol car, but could still see the house. She did not see appellant either at the front fence holding a dog or in the backyard. She later admitted that she would not have been able to see him if he had been at a certain location in the yard. She also said Deputy Money may have blocked her view of appellant when the deputy was leaning over the gate and spraying her dogs for no reason. He had also threatened to kill the dogs for no reason. On redirect examination, Ms. Long said Deputy

Hakker threatened to kill the dogs for no reason. Defense counsel then asked her, "So if somebody at the scene said kill the motherfuckers—" and before he could finish she replied, "It could have been the officer talking about killing my dogs, that is right. That is the truth."

Ms. Long was, however, able to see Logan dart out of the house and run towards the dog with the officer. Logan was not in an aggressive or attack stance—she would have recognized that type of stance. She admitted having told an investigator that Logan had escaped through the backyard gate, but testified at trial that he came out of the front door. In making this admission, Ms. Long said she had thought about it and that she was "fifty-some years old. I try to tell the truth as much as I can."

It was her opinion that if appellant locked the doors around the house, he did so to keep the dogs in, not to keep the officers out.

Ms. Long denied having any problems with law enforcement. She said she may have made a comment like "[l]et them motherfuckers in because they don't really give a damn[,]" while still on the phone with the dispatcher. If she did so, it was because she was upset and there were times when the officers would either not come or do what she wanted them to do when they did respond to her calls.

She also had negative things to say about Deputy Hakker's handling of the first incident between Terry and appellant. She faulted him for not doing anything to Terry even though he had threatened to kill her or inflict great bodily harm.

She also said she initially intended to file a complaint against Deputy Hakker and the other officer regarding their handling of the incident that led to the charges being filed in this case. She had already received the paperwork to do so when Deputy Hakker came by and apologized. She said he also told her that he was dropping the charges against her and her daughter but was going to get appellant. Her very next comment was that the officer was so decent she decided not to pursue her complaint against him.

Eleven-year-old Eric Davis was the next witness to testify for the defense. He remembered the day in question and identified a white pit bull named Hercules as his dog. He saw appellant holding Hercules near the front fence. Eric said appellant went to pick the dog up because the officers were spraying the dogs. Appellant did not point the dog at anyone or over the fence. He instead handed the dog to Eric, who then took him to the back room of the house.

Eric initially denied trying to hit Deputy Hakker with his grandmother's walking stick, but later admitted telling the deputy (after things had calmed down) that he did it because he did not want the officer to take his grandmother away. He denied trying to hit the same officer with a white chair when they were in front of the residence.

When asked where the brown pit bull Cleo was during this incident, Eric said she was initially chained up in the backyard but that appellant had removed the chain. Eric was asked whether the dog was taken off its chain when the police came back outside. He replied, "Yes, and he was taking them in a room."

Randy Westmorland, appellant's fiancée, who had one felony conviction for receiving stolen property in 1994, also testified for the defense. She said Deputy Hakker entered the house while Ms. Long was still on the phone with the dispatcher. He asked Ms. Long where the gun was located, and when she told him she did not have one, he directed her to stand and put her hands behind her back. The grandchildren started asking why their grandmother was being arrested, and everything escalated from there.

It was about this time that appellant picked up Cleo, who was in the living room with them, and put her in the back room. She did not hear appellant verbally threaten the officer with the dog or push it in the officer's direction. There were no other dogs in the house at this time.

Appellant did, however, come into the house with Hercules just as Deputy Hakker kicked in the side door. Ms. Westmorland said appellant was just putting the dog in the room to keep him away from the officer.

She had no personal knowledge whether appellant ever threatened the officers with a dog.

*The Prosecution's Rebuttal Case*

Deputy Hakker testified that he did not make a special trip to apologize to Ms. Long about this incident. He had been dispatched to the house on Thanksgiving Day to investigate a claim that one of the Hendersons had stabbed another one. He denied apologizing to her about the incident which led to the present charges being filed or making any admissions that the officers had acted inappropriately in handling the matter. What he did tell Ms. Long was that the entire incident could have been avoided had appellant not made matters worse.

He denied telling Ms. Long that he was going to get appellant. As for the other family members, he told her that it was up to the district attorney's office to decide whether they would be prosecuted.

The deputy then examined the photograph of Cleo, the brown pit bull. He said he had never seen that dog before. The dogs he was threatened with were either white or gray.

Deputy Money was recalled and denied having threatened to kill all the animals. He said he only threatened to kill the dog that appellant threatened him with and did so at the time the threat was being made.

DISCUSSION

I

*Sufficency of the Evidence to Support the Section 417.8 Convictions*

A. *Standard of Review*

■ "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319-320 [99 S.Ct. 2781, 2789-2790, 61 L.Ed.2d 560].) Reversal on this ground is unwarranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People* v. *Bolin*, *supra*, 18 Cal.4th at p. 331, quoting *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103], quoting *People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

B. *Review*

As pertinent, section 417.8 provides that "[e]very person who draws or exhibits any firearm . . . or other deadly weapon, with the intent to resist or

prevent the arrest or detention of himself or another by a peace officer," is guilty of a felony. Appellant raises two challenges to the sufficiency of the evidence to support his convictions under the section. The first challenge is directed at the deadly weapon element, while his second focuses on the intent needed to commit the offense. Each will be addressed in turn.

### 1. *The Deadly Weapon Claim*

 Appellant recognizes that the prosecution presented ample evidence to show that, as a breed, pit bulls can be dangerous and capable of causing great bodily injury to humans, but, insists there was no evidence to show these particular dogs were trained to attack or would do so when urged to by their handlers, as he believes is required under the code.[5] He also points to the lack of evidence that these specific dogs were physically capable of inflicting great bodily injury. As he sees it, without such evidence, the dogs could not be characterized as deadly weapons within the meaning of section 417.8. Appellant believes *People* v. *Nealis* (1991) 232 Cal.App.3d Supp. 1, 6 [283 Cal.Rptr. 376], supports his view.

Respondent believes the evidence amply demonstrated the dogs' capability of being used as deadly weapons and appellant's intention to use them as such. Respondent does not believe the statute requires the prosecution to show that these dogs had been specially trained for attack purposes.

 Even though section 417.8 has been in existence since 1983, it has been the subject of only two published opinions. In the first case, *People* v. *Simons* (1996) 42 Cal.App.4th 1100 [50 Cal.Rptr.2d 351], the court was asked to decide whether a screwdriver could be a deadly weapon under section 417.8. (42 Cal.App.4th at p. 1106.) The *Simons* court began its analysis by reciting the long-standing distinction between weapons that are inherently deadly or dangerous and those that are deadly or dangerous based only on the facts of the particular case: " ' "There are, first, those instrumentalities which are weapons in the strict sense of the word, and, second, those instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. The instrumentalities falling in the first class, such as guns, dirks and blackjacks, which are weapons in the strict sense of the word and are 'dangerous or deadly' or others in the ordinary use for which they are designed, may be said as a matter of law to be 'dangerous or deadly weapons.' This is true as the ordinary use for which they are designed establishes their character as such. The instrumentalities falling into the second class, such as ordinary razors, pocket-knives, hatpins, canes, hammers, hatchets and other sharp or heavy objects, which are not weapons in

---

[5]In advancing these claims, appellant assumes Cleo was the deadly weapon referenced in count 1, while Hercules was the subject of counts 2 and 3.

the strict sense of the word and are not 'dangerous or deadly' to others in the ordinary use for which they are designed, may not be said as a matter of law to be 'dangerous or deadly weapons.' When it appears, however, that an instrumentality other than one falling within the first class is capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, we believe that its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion." ' (*People* v. *Graham* (1969) 71 Cal.2d 303, 327-328 . . . [disapproved on other grounds in *People* v. *Ray* (1975) 14 Cal.3d 20, 29 [120 Cal.Rptr. 377, 533 P.2d 1017]], quoting *People* v. *Raleigh* (1932) 128 Cal.App. 105, 108-109 . . . ; see also *People* v. *Brookins* (1989) 215 Cal.App.3d 1297, 1305 . . . .)" (*People* v. *Simons*, *supra*, 42 Cal.App.4th at pp. 1106-1107; see also *People* v. *Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204].)

The *Simons* court placed the screwdriver within the second class of weapons and thus turned its attention to the manner in which it was used by the defendant. (*People* v. *Simons, supra*, 42 Cal.App.4th at p. 1107.) The court concluded that the defendant's use of the screwdriver to hold at bay the officers who wished to arrest him and who he believed were trying to kill him clearly showed the screwdriver was capable of being used as a deadly weapon and that the defendant intended to use it as such if the circumstances required. (*Ibid.*)

The focus of the second case, *People* v. *Pruett* (1997) 57 Cal.App.4th 77 [66 Cal.Rptr.2d 750], was somewhat different. Pruett insisted that the phrase "deadly weapon" had such a technical meaning that the trial court had a sua sponte duty to define it for the jury, even though the weapon in question was an open-blade knife. (*Id.* at p. 81.) The appellate court agreed that the phrase had a technical meaning in certain contexts but concluded that this was not one of them. (*Id.* at pp. 82, 86.) In reaching this conclusion, the *Pruett* court relied on the same cases as *Simons* to distinguish between items that can be characterized as deadly weapons as a matter of law and those that cannot. (*Id.* at pp. 82-86.) The court went one step further, however, and concluded that the intent portion of the *Raleigh* decision (i.e., that the possessor intended to use the dangerous or deadly instrument as a weapon should the circumstances require) need not be applied in section 417.8 cases because it would be redundant to do so. (57 Cal.App.4th at p. 86.) The *Pruett* court explained its reasoning as follows: "To find otherwise would be tantamount to rephrasing section 417.8 to make it a crime for a defendant to draw or exhibit 'a deadly instrument with the intent to use it as a weapon with the intent to prevent the arrest or detention of himself or another by a

peace officer.' The fact of the matter is that a jury's determination that a defendant employed a deadly instrument . . . with the intention of preventing his arrest or detention would necessarily include a finding that the deadly instrument was used as a weapon—or that the defendant intended to use it as a weapon . . . . " (*People* v. *Pruett, supra,* 57 Cal.App.4th at p. 86.)

After these two cases were decided, the Committee on Standard Jury Instructions approved the 1998 revision to CALJIC No. 9.21.1. This instruction defines the "deadly weapon" element of section 417.8 in the following way: "A deadly weapon is any object, instrument, or weapon which is used in such a manner as to be capable of producing death or great bodily injury."[6]

The parties acknowledge that the only published opinion to address whether a dog can be a deadly weapon is *People* v. *Nealis, supra,* 232 Cal.App.3d Supp. 1 (*Nealis*). *Nealis* involved a dog who tried to attack one person and did attack another in response to its owner's commands, and the prosecution for a violation of section 245 (assault with a deadly weapon) and section 242 (simple battery) that flowed from those events. (232 Cal.App.3d at p. Supp. 3.)

The *Nealis* court noted that the issue was one of first impression in California and, accordingly, turned its attention to decisions from other jurisdictions. The court observed that the "collective holding of these [out-of-state] cases is that a dog may be a deadly weapon if the person uses the dog to attack or threaten a human, and the dog is trained to respond to the person and is capable of inflicting serious injury." (232 Cal.App.3d at p. Supp. 4.) The *Nealis* court ultimately concluded that the dog in the case before it was a deadly weapon based on these cases and a definition of the phrase "deadly weapon" that was identical to one of the definitions given the jury in the present case. (Compare CALJIC No. 9.21.1 with *Nealis, supra,* 232 Cal.App.3d at p. Supp. 4.)

---

[6]Appellant's jury was instructed using this language. For some unexplained reason, they were also instructed in the language of CALJIC No. 16.291, which defined a deadly weapon (other than a firearm) as "any weapon, instrument, or object that is capable of being used to inflict death or great bodily injury." According to the July 1999 supplement to CALJIC, the Committee on Standard Jury Instructions withdrew its approval of CALJIC No. 16.291. (CALJIC No. 16.291 (6th ed. 1999 pocket pt.) p. 151.)

We note that appellant has not challenged the correctness of either of these instructions, only the sufficiency of the evidence to convict him of the offenses. While the instructions define the phrase "deadly weapon" in slightly different terms, CALJIC No. 9.21.1 is clearly the more restrictive of the two. We thus conclude that the evidence set out, *post*, to support appellant's conviction under this more restrictive standard, would also support appellant's conviction under the more encompassing standard employed in CALJIC No. 16.291. Accordingly, no prejudice could have accrued to appellant as a result of both instructions being given.

Based on the foregoing, we have no trouble concluding that the pit bulls exhibited by appellant, while not inherently deadly weapons, were such on this particular occasion. Prompted almost entirely by appellant's actions, the dogs were in an extremely agitated state and were reacting to what they perceived to be intruders on their property who threatened the safety of their owners. Those familiar with one of the dogs, Leo (or Cleo), readily admitted that she was, by nature, a people aggressive animal. She was such a problem that she had to be locked in a bedroom or chained in the backyard so she would not attack visitors, let alone threatening intruders. Other evidence showed that appellant and these dogs shared the home where these events took place so the jury could reasonably infer he was familiar with this dog's nature. In both encounters, both dogs were growling, snapping and barking at the intruding officers and struggling to break free of appellant's grasp. Appellant encouraged their aggressive response to the point where the dogs were clearly in an attack mode. He was thus aware of their willingness to attack the officers should he let go. He then held the dogs sufficiently close to the officers to enable them to attack should they break free of his hold. All three officers, some of whom had considerable contacts with dogs, feared for their safety due to the way these dogs were reacting to the emotionally charged situation. The expert testified that, as a breed, pit bulls are capable of inflicting great bodily injury or death due to their tremendous biting power and a tendency to lock onto their victim without letting go. The expert also testified that untrained dogs pose a greater risk of harm to outsiders.

Appellant believes the expert's testimony was insufficient to show these particular dogs capable of inflicting great bodily injury or death. He is mistaken. The expert's testimony referenced pit bulls as a breed. Necessarily, the pit bulls at the Lexington address fell within that group. What was lacking was any evidence to show that these dogs were somehow distinct from their breed and should therefore be excluded from that generalization. Indeed, other evidence showed these particular dogs were ready and willing to attack. This evidence, taken together, was sufficient to establish both dogs' ability to inflict death or great bodily injury.

Appellant also emphasizes the fact that these dogs were not specially trained to attack and relies on *Nealis, supra,* 232 Cal.App.3d Supp. 1 to advance this claim. We do not read *Nealis* as requiring proof that a dog must undergo special training before it can be deemed a deadly weapon. Training was at issue in *Nealis* simply because the dog in that case responded to its owner's commands. (*Id.* at pp. Supp. 3, 5-6.) We believe the ultimate question which must be answered is whether the dog would attack, regardless of any training it may or may not have received.

Thus, this claim must fail.

2. *Intent to Evade Arrest Claim*\*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## II, III\*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed. The matter is remanded to the sentencing court for the sole purpose of correcting the abstract of judgment to conform to these dictates.

Dibiaso, Acting P. J., and Wiseman, J., concurred.

---

\*See footnote, *ante*, page 453.