Filed 5/24/16  In re Brandon G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re BRANDON G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRANDON G.,<br><br>    Defendant and Appellant. | A144774<br><br> (Contra Costa County Super. Ct. No. J12-00766) |

Sixteen year-old Brandon G. was found guilty of assault with a deadly weapon on a peace officer (Pen. Code, § 245, subd. (c))[1] and resisting an executive officer (§ 69), after his family pit bull attempted to attack a police officer during a probation search.  On appeal, Brandon asserts the juvenile court's jurisdictional findings are not supported by substantial evidence.  We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In 2013, Brandon was declared a ward of the juvenile court after he pleaded no contest to charges he possessed ammunition (§ 29650) and engaged in street terrorism (§ 186.22, subd. (a)).  The court placed him on probation with various conditions, including submission of his home and person to warrantless search and seizure.

---

[1] Undesignated statutory references are to the Penal Code.

1

On January 8, 2015, a probation officer attempted to conduct a search of Brandon's home in Antioch. The search was not completed because no one opened the door. The officer also noted the presence of a "scary dog." Around the same time, the Concord Police Department's violence suppression unit became aware of numerous contacts between Brandon and fellow Sureño gang members in Concord.

On January 23, 2015, at approximately 7:00 a.m., Concord Police Officer Samuel Figueroa and several other officers went to Brandon's home to conduct a probation search.[2] The officers positioned themselves outside the home, in the area near a window, to the left of the front door. As the officers approached with their guns drawn, they heard and then saw a "loud barking, aggressive, snarling" dog at the window. Figueroa banged on the exterior metal security gate covering the front door and yelled in both English and Spanish, "Probation search. Open the door. Concord P.D." Another officer also yelled from the walkway: "Probation search. Put the dog away." The dog continued to bark, and Figueroa repeated his request to put the dog away.

Somewhere between 30 seconds and a few minutes later, Brandon's mother opened the front door, but did not unlock the metal security gate. Next to Brandon's mother was a "very muscular" pit bull, which weighed "maybe 60 pounds" and was barking, growling, and "being extremely aggressive." Figueroa told Brandon's mother, in Spanish and English, that he was conducting a probation search and directed her to put the dog away and unlock the security gate. Brandon's mother did not comply. A few seconds later, Brandon's brother, Carlos, stepped in front of his mother, and said he would not open the security gate without a search warrant.

Brandon stepped in front of Carlos and Figueroa told him, "Brandon, you need to open the door. This is a probation search." Figueroa also repeatedly ordered Brandon to put the dog away. Although he did not do so immediately, Brandon eventually unlocked the security gate. Carlos, who was holding the barking and growling pit bull by its collar,

<hr />

[2] Figueroa was dressed in plain clothes, but wore a police badge and a vest with the word "POLICE" on the front and back. Some of the other officers wore dark blue police uniforms.

tried to reclose the security gate after Brandon opened it. However, Figueroa kept the gate open a few inches with his foot. Figueroa informed the residents, "I'm going to hold the door here. I'm going to wait here. Put the dog away. I'm not going to come in, just put the dog away. I'll wait, but I'm holding the door." Carlos held the dog by its collar as it continued to bark and growl at Figueroa through the opening in the doorway. Fearing for his own and others' safety, Figueroa repeated the order to "put the dog away."

Brandon grabbed the dog from Carlos and moved the animal two to five feet away from the door, so it was no longer at the threshold. As soon as Brandon did so, Figueroa yanked open the metal security gate and entered the threshold of the home. Carlos immediately charged Figueroa, who responded by punching Carlos in the jaw. Carlos fell to the ground but continued to struggle with Figueroa.

At this time, Brandon was squatting about two feet to Figueroa's right, holding the pit bull back by its collar, as the dog lunged towards Figueroa and continued growling and barking. The home's exterior door led into a tight, confined foyer. Brandon and the dog blocked the hallway area, preventing the officers from moving beyond the threshold and further into the residence. The officers repeated several more times, "Put the dog away, put the dog away." Brandon made no effort to move the pit bull away, even though a kennel was only five feet from the front door. Instead, he held onto the pit bull's collar, moving his hand repeatedly forward and back. The dog appeared angry; it was growling, barking, and standing on its hind legs.

Officer Glenn Provost entered the house with Officer Tyler Prentice right behind him. Provost aimed his gun at the dog and ordered, "Put the dog away." Instead of complying, Brandon pulled the dog back up and opened his hand, releasing his grip on the pit bull's collar. After Brandon "let the dog go," it charged toward Provost. Before it reached Provost, Figueroa shot and killed the dog. Thereafter, the officers handcuffed Brandon, his mother, and Carlos.

Prentice testified the dog was about two feet from Provost when it was shot. Figueroa testified the dog was only "a couple of inches" from Provost. Although the

officers did not hear Brandon give any commands to the dog or say anything like "sic him" or "get him," Figueroa testified clearly that he saw Brandon "let go" by moving his hand up and open when the dog released. Figueroa testified, "It did not appear that [Brandon] lost control of the dog." He further explained, "Based on the way [Brandon] had the dog initially, he pulls the dog and then I see his hand go up like this. To me, it was obvious that he had let the dog go . . . ."

The Contra Costa County District Attorney filed a supplemental wardship petition, under Welfare and Institutions Code section 602, charging Brandon with assault with a deadly weapon (§ 245, subd. (c); count one) and resisting an executive officer (§ 69; count two). An enhancement for use of a deadly weapon (§ 12022, subd. (b)(1)) was alleged as to count two. Both offenses were alleged to have been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

At the conclusion of the contested jurisdictional hearing, the court sustained both counts. Although the juvenile court found the deadly weapon enhancement allegation supported by proof beyond a reasonable doubt, it did not sustain the criminal street gang allegations. At disposition, the juvenile court continued Brandon as a ward of the court and ordered his commitment to the Youth Offender Treatment Program for a term not to exceed 6 years and 199 days. Brandon filed a timely notice of appeal.

## II.    DISCUSSION

On appeal, Brandon maintains the juvenile court's jurisdictional findings are unsupported by substantial evidence. First, he challenges the juvenile court's finding that he committed an assault with a deadly weapon. Specifically, Brandon maintains no substantial evidence supports the findings that he used the dog as a deadly weapon or that he acted with the requisite intent. Next, he contends that count two and the deadly weapon enhancement is similarly unsupported by substantial evidence.

When faced with a substantial evidence challenge, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a

4

reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371.) "[O]ur perspective must favor the judgment. [Citations.] 'This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.] [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence . . . , it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it.' " (*Ryan N.,* at p. 1372.)

"[T]he direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.' [Citations.] Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the [fact finder]'s resolution." (*People v. Cudjo* (1993) 6 Cal.4th 585, 608–609.)

A.    *Assault with a deadly weapon*

Section 245, subdivision (c), provides: "Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years." The elements of assault with a deadly weapon are: (1) the defendant did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person; (2) the defendant did the act willfully; (3) when he or she did so, the defendant was aware of facts that would lead a reasonable

5

person to realize his or her act would result in the application of force to someone; and (4) the defendant had the present ability to apply force with the deadly weapon. (§§ 240, 245, subd. (a)(1); *People v. Golde* (2008) 163 Cal.App.4th 101, 120–123.) Brandon's challenge is to the first two elements.

In sustaining count one, the juvenile court specifically found that the pit bull was a deadly weapon capable of inflicting great bodily injury, and that Brandon released the pit bull intentionally. Brandon maintains no substantial evidence supports either finding. "A 'deadly weapon' within the meaning of . . . section 245 . . . is any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury. In determining whether an object not inherently deadly or dangerous acquires this characteristic, the trier of fact may look to the nature of the weapon, the manner of its use, and all other factors that are relevant . . . ." (*In re Jose R.* (1982) 137 Cal.App.3d 269, 275–276.)

California courts recognize a dog may be used as a deadly weapon, but "whether a specific dog in a given case is a 'deadly weapon or instrument' is ultimately a question of fact for the [trier of fact]." (*People v. Nealis* (1991) 232 Cal.App.3d Supp. 1, 4 (*Nealis*); accord, *People v. Henderson* (1999) 76 Cal.App.4th 453 (*Henderson*); *People v. Frazier* (2009) 173 Cal.App.4th 613.) If a defendant uses a dog to attack or threaten another person and the dog is capable of inflicting serious injury, the dog may be considered a deadly weapon. (*Henderson, supra,* 76 Cal.App.4th at pp. 469–470; *Nealis, supra,* 232 Cal.App.3d Supp. at p. 6.)

Relying on *Nealis, supra,* 232 Cal.App.3d Supp. 1, Brandon contends the juvenile court's deadly weapon finding was precluded by the absence of evidence Brandon trained or commanded the dog to attack. In *Nealis*, the defendant and her dog entered a restaurant parking lot where the dog attempted to attack an employee waiting for a ride. (*Id.* at p. 3.) When the employee's girlfriend arrived at the parking lot, the defendant ran up to her and began yelling, "Get her! Get her!" The dog obeyed the command and bit the girlfriend's leg. (*Ibid.*) The *Nealis* court held that, "depending upon the circumstances of each case, a dog trained to attack humans on command, or one without

6

training that follows such a command, and which is of sufficient size and strength relative to its victim to inflict death or great bodily injury, may be considered a 'deadly weapon or instrument' within the meaning of section 245." (*Id.* at p. 6.)

The Fifth District, in *Henderson, supra,* 76 Cal.App.4th 453, rejected Brandon's interpretation of *Nealis*, explaining, "[t]raining was at issue in *Nealis* simply because the dog in that case responded to its owner's commands. . . . [T]he ultimate question which must be answered is whether the dog would attack, regardless of any training it may or may not have received." (*Id.* at p. 470.)

In *Henderson*, the defendant was convicted of using a deadly weapon in order to resist arrest (§ 417.8) based in part on the testimony of police officers who responded to the defendant's home to defuse a family altercation. (*Henderson, supra,* 76 Cal.App.4th at pp. 455–456.) The defendant twice agitated a pit bull (apparently a different dog each time) by dragging the dog by the collar and shaking it within feet of the officers. (*Id.* at pp. 458–459.) Although the defendant maintained control of the dog, he threatened to let go while the dog had its front feet off the ground and growled. (*Id.* at pp. 458–459, 470.)

On appeal, the defendant's conviction was upheld because, while not inherently deadly weapons, substantial evidence showed these dogs were deadly weapons in the circumstances presented. (*Henderson, supra,* 76 Cal.App.4th at pp. 458, 470.) A professional dog trainer had testified about the aggressive traits of the pit bull breed, including pit bulls that are not trained to fight. (*Id.* at pp. 460–461.) The court observed: "In both encounters, both dogs were growling, snapping and barking at the intruding officers and struggling to break free of [the defendant's] grasp. [The defendant] encouraged their aggressive response to the point where the dogs were clearly in an attack mode. He was thus aware of their willingness to attack the officers should he let go. He then held the dogs sufficiently close to the officers to enable them to attack should they break free of his hold. All three officers, some of whom had considerable contacts with dogs, feared for their safety due to the way these dogs were reacting to the emotionally charged situation." (*Id.* at p. 470.)

7

Here, as in *Henderson*, substantial evidence shows Brandon encouraged the dog's aggression—by failing to contain the dog, keeping the dog close to the "intruding" officers, pulling the dog back on its hind legs and moving his hand back and forth on the dog's collar. Just as in *Henderson,* the dog was snarling, growling, and lunging towards the officers, who were only feet away. We are unpersuaded that *Henderson* is distinguishable because no expert testified here about the potential danger posed by the pit bull breed. The People's case might have been strengthened had it introduced expert testimony on the pit bull breed's nature, but such evidence is not essential. (See *People v. Brown* (2012) 210 Cal.App.4th 1, 8 [although "good practice" to introduce evidence "concerning the nature of the [weapon] and its ability to inflict substantial injury . . . , such evidence is not essential to establish the deadly nature of the weapon"].) Figueroa described the dog as a "very muscular" pit bull, which weighed "maybe 60 pounds" that was barking, growling, and "being extremely aggressive." The dog had been seen previously at the family home and described as "scary." From this evidence, the juvenile court could conclude that Brandon took advantage of this dog's known aggressive tendencies toward intruders by refusing to put the dog away, further agitating it in close proximity to the officers, and then releasing the dog to attack Provost. Substantial evidence, including testimony regarding the dog's size and strength, supports the court's findings that the dog was capable of inflicting serious injury and that Brandon used the dog to attack or threaten Provost. (*Henderson, supra,* 76 Cal.App.4th at p. 469; *Nealis, supra,* 232 Cal.App.3d Supp. at p. 6.)

Brandon raises a similar argument that insufficient evidence was presented with respect to intent. The juvenile court explicitly found that Brandon intentionally released the pit bull. Brandon contends the juvenile court had to find "that [Brandon] willfully attempted to commit a battery upon the officer by intentionally releasing the dog," and that any such implicit finding is unsupported by substantial evidence. It is Brandon's argument that is unsupported.

"[A]ssault with a deadly weapon is a general intent crime." (*People v. Colantuono* (1994) 7 Cal.4th 206, 213, fn. omitted.) "[I]t is black letter law that one cannot

unintentionally commit the crime of assault. In order to be found guilty of a criminal assault, one must have either the intent to batter, hit, strike, or wrongfully touch a victim; or one must have a general criminal intent to do an act which is inherently dangerous to human life—such as firing a cannon at an inhabited castle, or driving an elephant into a crowded judicial conference." (*In re Gavin T.* (1998) 66 Cal.App.4th 238, 240–241, italics omitted.) Our Supreme Court has held that "assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that *the act by its nature will probably and directly result in the application of physical force* against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790, italics added.) Courts will affirm convictions for assault with a deadly weapon when "a defendant's action enabl[es] him to inflict a present injury," even if an injury does not occur. (*People v. Chance* (2008) 44 Cal.4th 1164, 1172.)

Brandon asserts, "[Figueroa's] testimony did not establish that [Brandon] intentionally released the pit bull, as opposed to losing his grip on the agitated animal's collar." But, in fact, Figueroa testified that he observed Brandon, who was in control of the dog, open and release his hand from the pit bull's collar shortly after Figueroa punched and pinned Carlos to the ground.[3] The circumstances are not inconsistent with an intentional act. Immediately prior to releasing the dog, Brandon positioned himself and the dog so as to block further entrance into the house and made no effort to put the dog in its nearby kennel, despite repeated orders from police to do so. Contrary to Brandon's assertion, there was ample evidence Brandon had the ability to control the dog

---

[3] Brandon has forfeited any argument that the juvenile court improperly admitted opinion testimony from Figueroa that "it was obvious that [Brandon] had let the dog go." Generally, we will not consider claims of error that could have been but were not raised in the trial court. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 19–22.) In any event, Figueroa testified as a percipient witness and was competent to testify from his personal observation that Brandon's behavior was consistent with an intentional act. (See *People v. Weaver* (2012) 53 Cal.4th 1056, 1086 ["although in general, 'a lay witness may not give an opinion about another's state of mind[,] . . .a witness may testify about objective behavior and describe behavior as being consistent with a state of mind"].)

and was actually in control of the dog prior to its release. From this evidence, the trial court could reasonably infer that Brandon intentionally released the pit bull.

An alternative inference could be drawn from the evidence—that Brandon merely lost control of the dog. But the existence of an alternative inference is not dispositive. Nor does any inconsistency in Figueroa's testimony mean Figueroa's testimony is speculative, incredible, or "demonstrably false." It is not our role to interfere with credibility determinations by the juvenile court, which had the benefit of observing Figueroa's demeanor while testifying and his re-creation of Brandon's hand movements at the moment the dog was released. (See *In re Ryan N., supra,* 92 Cal.App.4th at p. 1372; *People v. Jones* (1989) 209 Cal.App.3d 725, 731.)

The juvenile court could also reasonably infer, from the officers' testimony, that Brandon was aware that the dog, which was highly agitated and aggressive, was within feet of the officers who were attempting to enter the home. Awareness of these facts would lead a reasonable person to infer a battery would be the direct, natural and probable result of Brandon's willful act of releasing the dog. Substantial evidence supports the juvenile court's findings with respect to count one.

B.    *Resisting an Executive Officer*

Brandon also maintains the evidence was insufficient to support the juvenile court's finding he attempted to deter or prevent Figueroa from performing his duties and used a deadly weapon in doing so. Section 69 "sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty. [Citation.] . . . [¶] A threat, unaccompanied by any physical force, may support a conviction for the first type of offense under section 69. [Citation.] . . . The central requirement of the first type of offense under section 69 is an attempt to deter an executive officer from performing his or her duties imposed by law; unlawful violence, or a threat of unlawful violence, is

merely the means by which the attempt is made."[4]  (*In re Manuel G.* (1997) 16 Cal.4th 805, 814–815.)  "The second way of violating section 69 expressly requires that the defendant resist the officer 'by the use of force or violence,' and it further requires that the officer was acting lawfully at the time of the offense."  (*People v. Smith* (2013) 57 Cal.4th 232, 241.)

The juvenile court found Brandon violated section 69 "by maintaining the pit bull in the vicinity of [the] officers and refusing repeated commands to put the dog away." Pointing out he opened the security gate and moved the dog several feet from the door, Brandon contends the evidence is only susceptible to one reasonable inference—that he "*enabled* Officer Figueroa to enter the home to conduct the probation search."  Brandon ignores that the officers were not attempting to merely enter the home, but to search it. The juvenile court rejected his inference and reasonably inferred that Brandon sought to deter Figueroa from carrying out the search.  This inference is amply supported by Brandon's refusal to comply with repeated commands to "put the dog away," his positioning of an agitated and aggressive pit bull to block the hallway, and the presence of a nearby kennel.  Substantial evidence supports the juvenile court's determination Brandon used a deadly weapon to deter Figueroa from performing his duties.

### III.    DISPOSITION

The judgment is affirmed.

---

[4] "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."  (§ 69, subd. (a).)

_____
BRUINIERS, J.

WE CONCUR:

_____
JONES, P. J.

_____
SIMONS, J.