Filed 3/19/15  P. v. Ruff CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B248823 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA096609) |
| v. | |
| DOMUNIQUE RUFF, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,

Victor D. Martinez, Judge.  Affirmed.

David L. Annicchiarico, under appointment by the Court of Appeal, for

Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Lance E. Winters, Senior Assistant Attorney General, William H. Shin and

Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

Domunique Ruff appeals from his conviction and sentence for assault on a peace officer with a deadly weapon, a pit bull, and resisting an executive officer. Ruff contends the evidence at trial was insufficient for the jury to have found his pit bull to be a deadly weapon because it did not actually "attempt to attack" the officers. Ruff also argues the court failed to augment the assault with a deadly weapon jury instruction to apply specifically to dogs. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

Andy Chen Fang lives on Bold Street in Rowland Heights. On January 11, 2012, at about 10:30 at night, Fang heard loud voices outside his house. He also heard someone "beat[ing on]" his mailbox. Fang looked outside and saw that his mailbox was "tilted." He called 911.

Three Los Angeles County Sheriff's Department patrol cars arrived in response to Fang's call. Deputy Michael Partin found defendant Domunique Ruff standing in his front yard next to the garage. (Ruff's house is one house east of Fang's.) Ruff had a large pit bull next to him. Partin asked Ruff "several times to put his dog away so [he] could talk to him." Ruff responded, "No . . . you come and get him." Deputy Luis Mrad was in the second car. As he pulled up, he saw Ruff pacing back and forth and yelling. LASD partners Brandon Seung and Denny Tseng arrived in the third car. Tseng -- a Mandarin speaker -- first spoke with Fang. Seung and Tseng then walked east to Ruff's house. Seung saw "a full grown pit bull" running and circling.

Ruff walked toward the officers. When he reached the edge of the property, Mrad told him to stop and sit down on the curb. Ruff did not comply. Ruff put his hands in the air, puffed out his chest, and kept walking toward the deputies in an aggressive manner. Ruff yelled, "Shoot me! Shoot me!" The pit bull was growling and pacing back and forth. Ruff then said to the dog, "Get 'em! Get 'em!" The pit bull turned its attention to the officers; began barking, growling, snarling, and showing its teeth; and advanced toward them. Deputy Seung was "extremely scared"; he and Tseng

2

retreated toward their patrol car. Mrad took cover behind the driver's side door of his car.

Ruff continued to come toward the officers. Mrad said, "Stop! Stop!" When Ruff got within eight to ten feet of Deputy Mrad, Mrad warned Ruff he was going to tase him if he did not stop. Ruff did not stop, and Mrad fired his taser. Ruff fell to the ground. Tseng and Seung approached Ruff to try to handcuff him. Ruff tucked his hands under his stomach, and the deputies had to pull on his arms for about 30 seconds to get them out from under him and apply the handcuffs. While Tseng and Seung were struggling to handcuff Ruff, the pit bull was circling and barking excitedly. The dog got within about six feet of Seung's face. Seung thought the dog was going to attack. Seung was even more frightened than he had been before. The pit bull came within two to three feet of Tseng. The dog was snarling and appeared to be getting ready to bite one of the deputies. Partin tased the dog. The pit bull fell to the ground but got up five to fifteen seconds later and started toward deputies again. Partin had to tase the dog two or more times. Eventually, the dog ran toward the front door of the house, away from the officers. The sheriff's deputies arrested Ruff.

In Mrad's opinion, Ruff was intoxicated or under the influence of something. Ruff's father testified at trial that he had come home around 5:00 or 6:00 p.m. to find an empty liquor bottle in the house. Ruff's father testified that Ruff was "totally drunk" and "completely out of it."[1]

Ruff's pit bull, Solo, was somewhere between five months and two years old at the time. Solo had lived with the Ruffs since he was a puppy, one to two months old. Ruff's father told officers that Solo was Ruff's dog.

2.    *The Charges*

The People charged Ruff with assault on a peace officer (Mrad) with a deadly weapon (the pit bull) in violation of Penal Code section 245(c) and with resisting an

---

[1]    That night, Ruff's father had told police that he did not know if Ruff had been drinking. When asked about this discrepancy at trial, Ruff's father said the police "could figure it out [for themselves]."

executive officer in violation of Penal Code section 69. In February 2013 the People amended the information to allege Tseng rather than Mrad as the victim in the assault count. The People alleged that Ruff had prior convictions for first degree burglary and for grand theft.

### 3. *The Trial, Verdicts, and Sentence*

The case went to trial in March 2013. Seung, Fang, Partin, Tseng, and Mrad testified for the People. Ruff called his parents, a neighbor and close friend, and Jill Kessler Miller, an expert on dog behavior. Miller described herself as a tester for the Animal Temperament Testing Society and a certified dog trainer. Miller had gone to the Ruffs' home and spent about 75 to 90 minutes with Solo. Miller observed Solo in his yard and inside the Ruffs' house as well as on a walk in the neighborhood. Miller said she had "stressed" Solo both inside the house and while on the walk. Miller had "startled" Solo to see how he would respond. Miller testified that Solo was "completely untrained." She said he was not vicious.

The jury convicted Ruff on both counts. Ruff waived jury on the priors and admitted them.

Ruff's maximum possible sentence was 17 years in the state prison. The People asked the court to sentence Ruff to 13 years. At the sentencing hearing on May 16, 2013, the trial court granted Ruff's motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) to strike his prior strike for residential burglary. The court selected the midterm of four years on the assault with a deadly weapon count and added five years under Penal Code section 667(a)(1). On the felony resisting count, the court sentenced Ruff to the midterm of two years concurrent with the assault count. Ruff's sentence was therefore nine years in the state prison.

### RUFF'S CONTENTIONS

On appeal, Ruff contends a dog cannot be a deadly weapon unless it has been trained to attack people or -- even though untrained -- it attacks in response to a command. Ruff argues the evidence at trial here was insufficient because Solo was "untrained" and he "did not make any actual attempt to bite [the deputies.]" Ruff also

4

contends the jury instruction the trial court gave on the assault count –
CALCRIM 860 - was inadequate. Finally, Ruff asserts that his felony resisting
conviction must be reversed because the trial court did not rule on his motion to reduce
it to a misdemeanor.

## DISCUSSION

1.    *Substantial Evidence Supports Ruff's Conviction for Assault*
      *with a Deadly Weapon on a Peace Officer.*

Evidence is sufficient to support a conviction if, "after viewing the evidence in
the light most favorable to the prosecution, *any* rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia*
(1979) 443 U.S. 307, 319 [italics in original]; *People v. Hill* (1998) 17 Cal.4th 800,
848-849; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) An appellate court must
ensure the evidence supporting the conviction is reasonable, credible, and of solid value,
but it must not reweigh evidence, reappraise the credibility of witnesses, or resolve
conflicts in the evidence. Those functions are the exclusive province of the jury or trial
judge. (*Id.* at p. 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) Reversal for
insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis
whatever is there sufficient substantial evidence to support [the conviction].' " (*People
v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745,
755.)

A deadly weapon within the meaning of California's assault statutes is " 'any
object, instrument, or weapon which is used in such a manner as to be capable of
producing, and likely to produce, death or great bodily injury.' " (*People v. Aguilar*
(1997) 16 Cal.4th 1023, 1028-1029.) "In determining whether an object not inherently
deadly or dangerous acquires this characteristic, the trier of fact may look to the nature
of the weapon, the manner of its use, and all other factors that are relevant to this issue."
(*People v. Nealis* (1991) 232 Cal.App.3d Supp. 1, 4.)

California courts -- following other jurisdictions -- have held that a dog may be
a deadly weapon. (See, e.g., *People v. Nealis, supra,* 232 Cal.App.3d Supp. 1, citing

5

cases; *People v. Henderson* (1999) 76 Cal.App.4th 453 (*Henderson*); *People v. Frazier* (2009) 173 Cal.App.4th 613.) "[D]epending on the circumstances of each case, a dog trained to attack humans on command, or one without training that follows such a command, and which is of sufficient size and strength relative to its victim to inflict death or great bodily injury, may be considered a 'deadly weapon or instrument' within the meaning of [Penal Code] section 245." (*People v. Nealis, supra,* 232 Cal.App.3d Supp. at p. 6.)

The prosecution is not required to prove that a dog has "undergo[ne] special training before it can be deemed a deadly weapon." (*Henderson, supra,* 76 Cal.App.4th at p. 470. See also *People v. Frazier, supra,* 173 Cal.App.4th at p. 619 ["the prosecution was not required to prove that defendant had rehearsed attacks with the dogs prior to the event"].) "[T]he ultimate question which must be answered is whether the dog would attack, regardless of any training it may or may not have received." (*Henderson, supra,* 76 Cal.App.4th at p. 470.)

Ruff concedes that Solo -- a full-grown pit bull -- "was of adequate size and strength to inflict serious injury." But, he argues, "there was zero evidence that Solo was trained to attack humans." And, he says, "no rational jury could have concluded, beyond a reasonable doubt, that Solo followed a command and attacked the officers."

The deputies testified that, when they arrived, Ruff was in front of his house in an agitated state, yelling and pacing. Solo -- unleashed -- was next to Ruff and then ran and circled in the yard and toward the sidewalk. As deputies began to approach Ruff, Ruff said to Solo, "Get 'em! Get 'em!" Solo turned his attention to the officers and began to advance aggressively, barking, growling, snarling, and showing his teeth. After Deputy Mrad tasered Ruff, Solo continued to approach the two officers who were trying to pull Ruff's hands from under his torso and handcuff him. Solo came within feet of the deputies. Partin had to taser Solo more than twice before he finally ran away from officers toward the house.

Ruff acknowledges the language in *Henderson* that the question -- one for the jury -- is "whether the dog would attack, regardless of any training it may or may not

6

have received." (*Henderson, supra,* 76 Cal.App.4th at p. 470.) Ruff argues, however, that a dog cannot be a deadly weapon unless it "actually attempt[s] to attack, in response to the defendant's command." Ruff asserts that Solo never snapped, lunged, or "charged" at the officers. Neither case law nor common sense supports Ruff's proposed distinction between a large pit bull who snarls and shows its teeth while coming near a person's face and one who "snaps," "lunges," and actually bites. A dog that -- at its owner's direction -- approaches a person growling, snarling, and showing its teeth can constitute a deadly weapon just as a loaded gun pointed at someone can be a deadly weapon even if the person holding it does not actually chamber a round. Whether a defendant "did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person" is a question for the jury. (See CALCRIM 860, par. 1.) Moreover, no one needs actually to have been injured for an assault to have taken place. (CALCRIM 860.)

        2.     *The Trial Court Did Not Err in Giving CALCRIM 860 as Written*

The trial court instructed the jury with CALCRIM 860. The instruction included this statement: "A *deadly weapon* is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." Ruff's trial counsel agreed the court should give this instruction. He never asked the court to modify or enhance the instruction. Accordingly, Ruff has forfeited any claim that the court should have added to the instruction to "explain the specific rule applicable to dogs -- that a dog can only be found to be a deadly weapon if it was trained to attack humans on command, or if it lacked such training but actually followed a command and attacked." "A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial. [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503. See also *People v. Jenkins* (2000) 22 Cal.4th 900, 1020 [claim that trial court failed to give clarifying or amplifying instructions was waived because defendant did not ask for clarification].)

In any event, Ruff's proposed amplification of CALCRIM 860 is not an accurate statement of the law, as discussed above. A dog need not actually have attacked for an assault to have occurred. Ruff's trial attorney presented appropriate arguments to the jury on the question of whether, under the circumstances, Solo was a deadly weapon that night. Counsel argued that Solo was not a trained attack dog, and that he was not aggressive or vicious. Counsel said Solo did not follow any "command" by Ruff to attack; instead, he acted as any ordinary dog would when excited by a commotion going on around him. The jury ultimately rejected this argument.

Accordingly, Ruff's trial counsel was not constitutionally ineffective. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1018 [failure to request additional instructions not ineffectiveness where court fully apprised jury of law]. Cf. *Weighall v. Middle* (9th Cir. 2000) 215 F.3d 1058, 1063 [failure to request particular instructions not ineffectiveness where defense argument adequately focused the defense theory].)

3.      *The Trial Court Implicitly Denied Ruff's Motion To Reduce His Resisting Conviction to a Misdemeanor*

Finally, Ruff notes that the trial court never ruled on his motion to reduce his conviction for felony resisting of an executive officer in violation of Penal Code section 69 to a misdemeanor. Ruff argues his conviction on that count must be reversed and the matter remanded for a ruling.

Resisting an executive officer under Penal Code section 69 is a "wobbler." After the jury convicted Ruff on both the assault and resisting counts, his trial counsel filed a motion to strike his strike prior on both counts and to reduce the resisting count to a misdemeanor under Penal Code section 17(b). At the sentencing hearing, the court and the attorneys spent considerable time talking about the *Romero* motion and what the sentence should be. As noted above, the court granted Ruff's *Romero* motion and struck his strike as to both counts. The court sentenced Ruff to concurrent time on the resisting count.

Thus, in the face of the prosecution's opposition to the *Romero* motion and its request for a 13-year sentence, the trial court granted the motion and sentenced Ruff to

four years less than what the prosecution had asked for. While the court did not explicitly deny the 17(b) motion, a denial is implicit in the court's striking Ruff's strike as to the resisting count and giving him concurrent state prison time. The trial court is presumed to know and apply the relevant statutory and case law. (Evid. Code, § 664; *People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046.) Accordingly, we presume the trial court understood its discretion to treat the offense as a misdemeanor. It is understandable that -- having stricken Ruff's strike and given him concurrent time -- the court did not find a reduction to a misdemeanor to be appropriate given the facts presented at trial.[2]

---

[2] Ruff cites *In re Manzy W.* (1997) 14 Cal.4th 1199 in support of his argument that remand is necessary. That case is inapposite because it is a juvenile case. Manzy W. had methamphetamine in violation of Health & Safety Code section 11377(a), a wobbler. The juvenile court committed Manzy to the California Youth Authority. Manzy argued on appeal -- and the Court of Appeal agreed -- that the juvenile court had failed to specify whether the drug charge was a felony or misdemeanor, as expressly required by Welfare & Institutions Code section 702. Ruff is an adult; therefore the specific requirements of the Welfare & Institutions Code for juvenile cases do not apply here.

## DISPOSITION

The judgment and sentence are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.[*]

WE CONCUR:


EDMON, P. J.


KITCHING, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.