Filed 5/5/26  P. v. Sheriff CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ISHMAEL WAREND SHERIFF,<br><br>        Defendant and Appellant. | A168228<br><br>(Contra Costa County<br>Super. Ct. No. 042200025)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**[NO CHANGE IN JUDGMENT]** |

**BY THE COURT**[*]:

It is ordered that the non-published opinion filed on April 27, 2026, be modified as follows:

1.  The following paragraph shall be added to the end of the DISCUSSION, immediately before the DISPOSITION:

Finally, Sheriff urges us to deem the failure to object on RJA grounds ineffective assistance of counsel (IAC).  We are not persuaded to do so.  To prevail on an IAC claim, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of

---

[*] Banke, Acting P. J., Langhorne Wilson, J. and Smiley, J. participated in the decision.

1

reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Here, as Sheriff acknowledges, the statutory scheme sets forth "[f]our categories of conduct [that] establish a violation if proved by a preponderance of the evidence," (§ 745, subd. (a)), but "a victim's references to a defendant's race in a victim impact statement are not explicitly enumerated among the specified conduct that would violate the RJA." Sheriff has not cited any published case applying the RJA in a victim-impact-statement context, much less any such case of which Sheriff's trial counsel should have been aware. And the superior court's statement qualified the relevance of the racial remarks by saying they were "not irrelevant to" the victim's mother, and that her "feelings [were] valid" in the context of a broader statement in which the court was simply observing that "victims are allowed to speak." Under those circumstances, in which at least one reasonable interpretation of the superior court's remarks does not reveal any intent to sentence Sheriff more harshly on account of his race, and where an objection under the RJA and arising from a victim impact statement would have rested on a rather novel reading of the relevant law, we cannot conclude that the decision of Sheriff's counsel not to invoke the RJA, was objectively unreasonable.

This modification effects no change in the judgment.

The April 29, 2026, petition for rehearing is denied.


Date:_____                    _____ Acting P. J.


*People v. Sheriff* / (A168228)

2

Filed 4/27/26  P. v. Sheriff CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ISHMAEL WAREND SHERIFF, <br><br> Defendant and Appellant. | A168228 <br><br> (Contra Costa County <br> Super. Ct. No. 042200025) |

After a jury found Ishmael Warend Sheriff guilty of torture (Pen. Code,[1] § 206) and attempted sexual penetration by means of force, violence, duress, menace, and fear (§§ 664, 289, subd. (a)(1)(A)), among other crimes, he was sentenced to seven years to life in prison for the torture conviction, consecutive to an aggregate determinate term of eight years and eight months, including one year for the attempted sexual penetration.  In this appeal, he claims: (1) the torture conviction is unsupported by substantial evidence; (2) the attempted sexual penetration conviction is likewise unsupported by substantial evidence; (3) the trial court erred in admitting evidence of Sheriff's previous attack on the victim; (4) in light of the indeterminate sentence for torture, the consecutive sentence for attempted

---

[1] Undesignated statutory references are to the Penal Code.

1

sexual penetration is barred by section 654's prohibition of punishing the same act under more than one provision; and (5) the trial court violated the Racial Justice Act (RJA; § 745) in its response to racial remarks made by the victim's mother in a victim impact statement. Because Sheriff's last claim is forfeited and his others lack merit, we will affirm.

## I. BACKGROUND

Sheriff and the victim had dated for about three years before the events underlying this case. When those events transpired, the two were living together in an apartment in Antioch. The victim worked as an escort who provided sexual services for money. Sheriff would advise the victim on matters related to her work, reviewing her online advertisements and instructing her never to engage in unprotected sex. After a customer paid for sexual services, the victim would send the money to Sheriff. The two broke up for about three months and then reconciled at Sheriff's insistence, with the victim moving back into the apartment and the previous financial arrangement resuming.

One day, Sheriff choked the victim during an argument, leaving scratch marks on her neck. Two days later, Sheriff undertook a course of conduct by which he tortured and variously assaulted the victim for more than 24 hours. Early that morning, a man had arrived at the apartment and engaged in sexual activity with the victim in exchange for money. Sheriff had previously approved this transaction, but told the victim not to allow the man to "wander all around the house [or] go into the kitchen" or the bedroom. In order to make sure these instructions were followed, Sheriff placed a phone camera in the kitchen and recorded the interaction. After the man paid the victim and left the apartment, Sheriff returned and began to question the victim about various details of her encounter with the man. When Sheriff

2

accused the victim of lying, she suggested that he review the video from the phone camera.

While they were watching the video, Sheriff began to assault the victim. The assault included: slapping and punching her in the face, back and abdomen; kicking her in the legs with heavy boots; manually striking her in the head and hand with the same boots; tying socks around her mouth so that she could not scream "nearly as much"; whipping her about five times with a cord; urinating on her face and in her mouth and ordering her to swallow the urine; ordering her to pick up, chew, and swallow feces produced by Sheriff's dog;[2] handcuffing her arm to her leg; and burning her leg and buttocks with a torch lighter.

At one point, Sheriff instructed the victim, who was not wearing underwear, to sit on the living room floor and spread her legs. Her vagina was exposed and her vaginal lips were open. Sheriff then called his dog over and told the dog to lick, but the dog just lay in place. After Sheriff reiterated the command three to five times, the dog, which had not been trained to lick on command, briefly sniffed the victim's vagina. When this occurred, the dog's nose made contact with the outer vulva for about two to three seconds.

Sheriff then ordered the victim into his car, handcuffed and with a ski mask to hide some of her injuries. The assault continued, as Sheriff: punched her in the face; hit her in the knees and hands; used a knife to "slice" her hand and arm; used the same knife to jab her legs several times; and used a flashlight to hit her in the face, hand and knee about 20 times. When Sheriff

---

[2] Sheriff forced the victim to comply with this order by threatening to hit her again. The victim complied, trying whatever she could to calm the situation. About three times, the forced attempts to swallow the feces resulted in vomiting, but Sheriff did not allow the victim to rinse out her mouth.

eventually stopped at a Denny's restaurant to order food, he left the victim in the parking lot, handcuffed to the passenger-side headrest. The victim removed the headrest and escaped the car when Sheriff went inside to collect his order, but Sheriff saw the victim inside the restaurant and promptly attempted to drag her back to the car. Finally, the victim successfully broke free of Sheriff's grip and Sheriff fled the scene.

The District Attorney charged Sheriff by information with torture (§ 206; count 1); attempted sexual penetration by a foreign object by force, violence, duress, menace, or fear (§§ 289, subd. (a)(1)(A) & 664; count 2); causing injury to a cohabitant (§ 273.5, subd. (a); counts 3 & 10); false imprisonment by violence (§§ 236, 237; count 4); kidnapping (§ 207, subd. (a); count 5); assault with a deadly weapon (§ 245, subd. (a)(1); count 6); reckless evasion of a peace officer (Veh. Code, § 2800.2; count 7); pimping (§ 266h, subd. (a); count 8); and pandering (§ 266i, subd. (a)(2); count 9).

In limine, the trial court denied Sheriff's motion to exclude evidence of a prior uncharged domestic violence offense in which he assaulted the same victim. After the presentation of evidence, Sheriff successfully moved to dismiss under section 1118.1 to dismiss the pandering charge. The jury found Sheriff guilty of all remaining charges, and it found true the three enhancement allegations. During a victim impact statement, the victim's mother made repeated references to Sheriff's race, expressing her dismay that a Black man would "tear down" a Black "woman like this." Sheriff was ultimately sentenced to seven years to life in prison for count 1, to be served consecutively to an aggregate determinate term of eight years, eight months, for the other offenses.

4

## II.  DISCUSSION

### *A.*  **Substantial Evidence Supports the Torture Conviction**

Sheriff argues his torture conviction is not supported by substantial evidence.  Specifically, he contends there is no substantial evidence to support a finding that Sheriff acted "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."  (§ 206 [defining torture].)  We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' "  (*People v. Medellin* (2020) 45 Cal.App.5th 519, 526–27.)

" 'Courts have interpreted intent to inflict "cruel" pain and suffering as intent to inflict extreme or severe pain.'  [Citation.]"  (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1426.)  This "intent to cause severe pain need not be proven by direct evidence, but can be inferred from the circumstances of the offense . . . ."  (*Id.* at pp. 1429–1430.)  Here, that Sheriff acted with such intent is sufficiently evident from the circumstances.  Because there is a surfeit of such circumstances, we will highlight a few representative examples:  During a course of conduct that lasted more than a day, Sheriff

5

punched the victim nearly 50 times, hit her 15 to 20 times with a work boot and 20 times with a flashlight, burned her body with a torch lighter, stabbed her with a kitchen knife, and whipped her with the cord of a flat iron five times. Some of this conduct occurred after the victim's screams prompted Sheriff to gag her with socks. Photographs admitted at trial showed injuries all over her body including scalp wounds, a gash on her face from being struck with the boot or flashlight (and which required stitches), a "busted" lip, various lacerations, bruises, swelling, and burn marks, and two black eyes. She spent four days in the hospital. On a pain scale of one (least) to ten (most), the victim described feeling pain all over her body she rated as an eight or nine. Under the circumstances,[3] it is reasonable to infer from the sheer volume of abuse Sheriff inflicted on the screaming victim that, whatever other intentions he might have had, Sheriff also intended to cause the victim severe pain to a degree inexplicable by any other motive.

Substantial evidence also supports the finding that Sheriff acted "for the purpose of revenge." (§ 206.) The victim was a sex worker and Sheriff's live-in girlfriend. Before the act of prostitution that anticipated Sheriff's crime, Sheriff had set up his phone camera inside their apartment to capture the encounter between the victim and her customer. The victim testified that Sheriff's abuse began after she and Sheriff viewed the resulting video, and Sheriff began accusing her of cheating on him. He then interrogated her about perceived violations of their purported agreements concerning such encounters; he asked the victim when she and Sheriff had agreed that she

---

[3] Sheriff's calculated behavior—restraining the victim in handcuffs and silencing her screams—refutes any suggestion his conduct was a mere " 'explosion of violence [citations] or an "act of animal fury" ' rather than an intent to inflict pain for revenge, extortion, persuasion, or other sadistic purpose." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

6

could sit with the customer on the couch, and he became angry when the video showed the customer walking into the kitchen for a glass of water, in violation of an earlier agreement to keep customers out of the kitchen. From this sequence of events, it is reasonable to infer that Sheriff's aim in assaulting the victim was to punish her—to get revenge—for the victim's alleged failures to honor their agreement.

In sum, the torture conviction is supported by substantial evidence.

## B. Substantial Evidence Supports the Conviction for Attempted Sexual Penetration

According to Sheriff, his conviction for attempted sexual penetration "based on [an] incident in which he commanded or tried to coax his dog to lick [the victim's] vagina, is supported by insufficient evidence to establish he took a direct step toward getting his dog to commit a penetration or even intended that his dog commit a penetration." We disagree.

Section 289, subdivision (a)(1)(A), proscribes any "act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." An attempt to commit a crime requires "proof of both specific intent to commit the crime and a direct, but ineffectual, act done toward its commission." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1126.)

First, we disagree with Sheriff's argument that the evidence was legally insufficient "to prove . . . he intended the dog [to] *penetrate*" the victim's vagina instead of simply licking it. Sheriff told the victim, who was not wearing underwear, to sit on the ground in the living room and spread her legs, with her "knees . . . propped up." She was exposed. In her testimony at trial, when the victim was asked whether "the lips to [her]

7

vagina [were] open or spread open," she replied, "Yes." When Sheriff then told the dog to come closer to the victim, she closed her legs. Sheriff responded by telling her to reopen them "and let the dog lick down there." Sheriff "tried to maybe coax the dog into licking [her]." After three to five commands to the dog, it eventually sniffed and touched its nose twice around the victim's vulva. From Sheriff's commands, and the exposed position he directed the victim to assume, it is reasonable to infer that his act of commanding his dog to lick the victim's vagina evinced an intent for the dog's tongue to penetrate the opening of her genitals, however slightly. Because such penetration is proscribed by section 289 (see *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1371 [contact with the genitalia inside the exterior of the labia majora, including the vagina, constitutes "sexual penetration" within the meaning of section 289]), there is substantial evidence of Sheriff's intent to commit that crime.

Second, we reject Sheriff's contention that no substantial evidence supports a finding that he took a direct step toward the commission of the crime because "no evidence shows that [the] dog had ever been trained to lick anything in particular when appellant coaxed or commanded it to do so . . . ." There was no testimony to suggest that Sheriff somehow lacked the mental capacity to understand the relationship between cause and effect. To the contrary, by the time he issued commands to his dog, Sheriff had already successfully brought his will to bear on the external world: striking the victim and thereby causing her pain and gagging her with socks to muffle her screams. The victim also testified that the dog usually listened to commands well, "know[ing] usually what his owner [wa]s saying . . . ." And here it was Sheriff's repeated urging of the dog to lick her vagina, coupled with his repeated insistence that the victim open and reopen her legs to expose herself

8

before the animal that allowed—at a minimum—the inference that Sheriff believed his dog capable of performing the act given the conditions he created.

With attempt crimes, " ' "[t]here is a material difference between the preparation antecedent to an offense and the actual attempt to commit it. The preparation consists of *devising or arranging the means or measures necessary for the commission of the offense,* while the attempt is the direct movement toward its commission after the preparations are made. In other words, to constitute an attempt the acts of the defendant must go so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances." ' " (*People v. Luna* (2009) 170 Cal.App.4th 535, 540–41.) Sheriff's claim of insufficient evidence focuses on the dog's lack of any specific training to lick on command, and because Sheriff did not do anything, beyond coaxing, to induce the dog to lick the victim.[4] Sheriff contends he had no ability to "get his dog to lick" the victim's vagina.

With or without training, dogs have been recognized by California courts as instrumentalities of crime. (See e.g., *People v. Nealis* (1991) 232 Cal.App.3d Supp. 1, 6 [depending upon the circumstances of each case, even an untrained dog that follows a command to attack and is of sufficient size and strength relative to inflict death or great bodily injury, may be considered a " 'deadly weapon or instrument' " within the meaning of section 245]; *People v. Frazier* (2009) 173 Cal.App.4th 613, 618–619 (*Frazier*) ["A dog may be the instrumentality of an attack causing great bodily injury just as a loaded gun or knife can be" and the prosecution is not "required to disprove an instinctive canine attack when the testimony showed defendant's express

---

[4] As an example of an inducement, Sheriff points to the lack of evidence that he put "food substance" on the victim "to attract the dog."

command to an obeying dog."].) In *Frazier*, the defendant's act of commanding a dog to attack the victim was sufficient proof that he "personally" inflicted great bodily injury in violation of section 12022.7. In *People v. Henderson* (1999) 76 Cal.App.4th 453, 470, it was held that "while not inherently deadly weapons", the defendant's encouragement of his aggressive dogs' behavior toward peace officers supported his conviction for exhibiting a deadly weapon with the intent to resist arrest. (*Id*. at p. 467; see § 417.8.) These cases reveal that, at least as far as personal-use enhancements and the offenses of assault and exhibiting a deadly weapon are concerned, the contextual circumstances and the manner in which an animal is commanded or handled may be determinative of whether one has used that animal as an instrumentality of crime. Accordingly, we find it reasonable for a finder of fact to conclude that Sheriff's use of the dog in this case, as explained above, constituted the direct but ineffectual act necessary to support his attempted sex offense conviction.[5]

Moreover, convictions for attempts have been upheld where " 'defendants had the specific intent to commit the substantive offense and . . . under the circumstances as the defendants reasonably saw them[,] they did the acts necessary to consummate the substantive offense; but because of circumstances unknown to defendants, essential elements of the substantive crime were lacking.' " (*People v. Cecil* (1982) 127 Cal.App.3d 769, 776.) Thus, a conviction for an attempted crime will not be reversed for the *actual*

_____

[5] We therefore reject Sheriff's effort to liken his case to *Luna*, a case where no action by the defendant showed he had moved beyond the preparation stage to manufacture controlled substances. Without having obtained an essential ingredient to manufacture the drug, Luna had not taken an " 'unequivocal overt act which can be said to be a commencement of the commission of the intended crime.' " (*People v. Luna, supra*, 170 Cal.App.4th at p. 543.) In this case, all the components of the offense were present, choreographed by, and under Sheriff's direction.

impossibility of the target crime's commission under the circumstances if "the means used by the defendant and the surrounding circumstances make the crime *apparently* possible." (*People v. Van Buskirk* (1952) 113 Cal.App.2d 789, 793 [upholding attempted murder conviction where defendant used defective gun], italics added.) Here, even if (contrary to Sheriff's manifest expectations) the dog did not understand or would not obey the command to lick, the fact that the dog was obedient and would usually heed its owner's commands, along with the fact that a dog's tongue could in principle be a means of penetration, supply sufficient evidence for the apparent possibility of committing attempted sexual penetration.

Substantial evidence supports the conviction for attempted sexual penetration.

## C. There Was No Abuse of Discretion in Admitting Evidence Regarding Sheriff's Previous Attack on the Victim

Sheriff contends the trial court abused its discretion in admitting evidence that Sheriff "committed a prior uncharged domestic violence offense against" the victim. We disagree.

Evidence Code section 1109 provides, with exceptions not relevant here, that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code s]ection 1101" and its general prohibition of character evidence to prove conduct, as long as "the evidence is not inadmissible pursuant to [Evidence Code s]ection 352." In turn, Evidence Code section 352 allows a "court in its discretion [to] exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or

11

of misleading the jury." "We will not overturn or disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

Sheriff argues the trial court abused its discretion in admitting evidence under Evidence Code section 1109 because its probative value was outweighed by the danger of undue prejudice under Evidence Code section 352. However, relying on *People v. Ewoldt* (1994) 7 Cal.4th 380, 405, Sheriff acknowledges in his opening brief that "the prejudicial effect of prior crimes evidence is evaluated with reference to whether the evidence of the prior crimes is 'stronger' or 'more inflammatory' than the evidence concerning the charged crime, and whether the defendant was already convicted for the prior crimes so that the jury is not tempted to convict him of the charged crime to punish him for the prior crimes." Here, the evidence of the prior assault, in which Sheriff punched the victim once, was considerably weaker and *less* inflammatory than the evidence supporting his conviction for torture, which we have already surveyed.

Further, the general presumption against admitting evidence of prior uncharged offenses is based in significant part on the possibility that a jury might have a "tendency to condemn, not because [the defendant] is believed guilty of the present charge, but because he has escaped unpunished from [the] other offense . . . ." (*People v. Thompson* (1980) 27 Cal.3d 303, 317.) But no such possibility arises from the record here. First, the court's instructions to the jury detailed how it was permitted to consider the evidence. Beyond that, we are unconvinced the trajectory of Sheriff's hypothetical argument points to an abuse of court discretion. That is to say, a hypothetical jury that did not believe beyond a reasonable doubt that Sheriff was guilty of torture

12

and the seven other offenses of which he was convicted, but still wanted to punish him for punching the victim once, could have done so by finding Sheriff guilty of just one of the charged offenses, such as the causing-injury-to-a-cohabitant charge in Count 3. Instead, the real jury found him guilty of that charge *and* even graver crimes like torture, thus belying any suggestion that the verdict was motivated by the uncharged prior offense. For those reasons, the prior-offense evidence posed no danger of undue prejudice, and no such danger could outweigh the evidence's probative value.

### D. There Was No Error Under Section 654

Sheriff argues "the torture and attempted sexual penetration were part of an indivisible transaction to which section 654"—forbidding multiple punishment for the same act—"applies." Again, we disagree.

"Section 654 provides that even though an act violates more than one statute and thus constitutes more than one crime, a defendant may not be punished multiple times for that single act. [Citation.] The 'act' which invokes section 654 may be a continuous ' "course of conduct" . . . comprising an indivisible transaction . . . .' [Citation.] 'The divisibility of a course of conduct depends upon the intent and objective of the defendant . . . . [I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Akins* (1997) 56 Cal.App.4th 331, 338–39.) "Where, as here, the court made no express findings on the issue, a finding that the crimes were divisible is implicit in the judgment and must be upheld if supported by substantial evidence." (*People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1083.) Accordingly,

13

we review the trial court's implicit determination in this respect for substantial evidence. (*Ibid*.)

As we have already observed, torture requires the "intent to cause cruel or extreme pain and suffering." (§ 206.) This means "*physical* pain or suffering." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047 (*Mejia*).) But nothing in the evidence concerning the attempted sexual penetration reveals such an intent. Rather, the victim described Sheriff's dog as "a really good dog" and "very sweet." Her testimony did not associate any physical pain with the result of Sheriff's commands for the dog to lick her, the position Sheriff made her assume, or the dog touching her. The record evidence provides no reason to believe that cruel or extreme physical pain or suffering resulted. Consequently, we will not disturb the trial court's implicit finding that the attempted sexual penetration was divisible from the course of conduct underlying the torture conviction.

As for *Mejia, supra*, 9 Cal.App.5th, Sheriff's reliance on that case is misplaced. Granted, *Mejia* held that "section 654 precludes imposition of unstayed sentences for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove that element."[6] (*Mejia*, at pp. 1044–45.) But *Mejia* is distinguishable from the present case because, unlike the spousal rape in *Mejia* and as we have noted, there is evidence here that the act of attempted sexual penetration "was not a part of [the] course of conduct" underlying Sheriff's commission of torture. (*Id*. at p. 1045.) Similarly, unlike the final assault described in *Mejia*, there is a basis here "for concluding that the [attempted sexual penetration] was . . . in some . . .

---

[6] Apparently recognizing this distinction at the sentencing hearing, the trial court stayed four counts (domestic battery [count 3], false imprisonment [count four], kidnapping [count five], and assault with a deadly weapon [count six]) and three accompanying great bodily injury enhancements.

14

manner distinct from" the torturous acts. (*Id.* at p. 1046.) In short, no evidence suggests the attempted sexual penetration either contributed to any cumulative infliction of great bodily injury, or manifested any intent to cause physical pain or suffering. Thus, regardless of any errant comments by the prosecutor suggesting otherwise, the attempted sexual penetration could not have been "essential to satisfying an element of" torture. (*Ibid.*) Section 654 does not apply.

## E. Sheriff's Claim Under the Racial Justice Act Is Forfeited

According to Sheriff, "the trial court violated the Racial Justice Act when it permitted the complaining witness's mother to refer repeatedly to [Sheriff's] race in her victim impact statement, ruled the racial references were relevant, and implicitly considered those references when it imposed sentence." (Capitalization and boldface omitted.) However, as the Attorney General notes in his brief, appellant's admitted failure to raise the RJA claim below has resulted in his forfeiture of the claim on appeal.[7] For this proposition, the Attorney General correctly cites three cases: *People v. Lashon* (2024) 98 Cal.App.5th 804, 815–817, *People v. Singh* (2024) 103 Cal.App.5th 76, 112–116, and *People v. Corbi* (2024) 106 Cal.App.5th 25, 41. By contrast, respondent has cited no authority for the proposition that an RJA claim on appeal is not thus subject to forfeiture. We therefore deem the claim forfeited.

## III. DISPOSITION

We affirm.

---

[7] In his reply brief, Sheriff contends "the defense did persistently object to the witness's racial references and asked the court to strike those references from the record," while conceding that this was "not explicitly on grounds provided by the RJA." But preserving a claim for appeal generally requires an objection at trial on the specific ground asserted on appeal. (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 893.)

_____

SMILEY, J.

WE CONCUR:

_____

BANKE, Acting P. J.

_____

LANGHORNE WILSON, J.

*People v. Sheriff* / (A168228)

16